The OFFICERS FOR JUSTICE, et al.,
Plaintiffs-Appellees,

and

Jesse J. Byrd, Plaintiff-Appellant,

v.

The CIVIL SERVICE COMMISSION OF the CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants-Appellees.

UNITED STATES of America,
Plaintiff-Appellee,

v.

The CITY AND COUNTY OF SAN FRANCISCO, et al.,
Defendants-Appellees.

No. 79–4285.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 11, 1981.

Decided Sept. 21, 1982.

Roland Mallory, Mallory, Shamiyeh & Bowie, San Francisco, Cal., for plaintiff-appellant.

Michael C. Killelea, Deputy City Atty., Lois Salisbury, Maimon Schwartzchild, Asst. U. S. Attys., San Francisco, Cal., argued for defendants-appellees; George Agnost, City Atty., San Francisco, Cal., on brief.

Before ANDERSON and NORRIS, Circuit Judges, and TAKASUGI,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

I.

This appeal requires us to review a consent decree negotiated in settlement of a class action suit challenging allegedly discriminatory employment practices in the San Francisco Police Department. Jesse Byrd, a named party plaintiff and class representative, renews the objections to the settlement that he raised in the court below. The district court, 473 F.Supp. 801, rejected his and others' objections and en-

* The Honorable Robert M. Takasugi, United States District Judge for the Central District of California, sitting by designation.

1. The Officers for Justice, a membership association of minority personnel of the S.F.P.D.,

tered judgment. We now affirm the district court's order validating and approving the consent decree.

II.

Most of the pertinent background of this lawsuit can be gleaned from the several published orders (referenced below) issued by the district court at various stages in this lengthy litigation. Rather than further clutter and unnecessarily enlarge the federal reporter system with all the factual details of the case, we will repeat and expand upon only those aspects particularly relevant to the specific objections advanced by Byrd.

The suit was initiated in April, 1973, and was styled as a class action. The named plaintiffs were eleven individuals, including Byrd, and five organizations[1] representative of the interests of various minority groups in San Francisco. The complaint named as defendants the San Francisco Civil Service Commission and the Police Commission. The Chief of Police and various other officials were sued in their official capacities. The San Francisco Police Officers Association, the certified collective bargaining agent for the police officers of San Francisco, intervened as defendants.

The complaint charged defendants with having promulgated a widespread pattern and practice of racial and sexual employment discrimination in hiring, promotion, and job assignments, in violation of 42 U.S.C. § 1981 and § 1983, and sections of the United States and California Constitutions. In addition to specific allegations of discrimination by the named plaintiffs, the complaint set forth a rather forceful statistical demonstration. The statistics reflected striking differences between the racial and sexual composition of the S.F.P.D. and that of the city. These groups appeared to be vastly underrepresented in the

National Association for the Advancement of Colored People (Western Region), League of United Latin American Citizens, Chinese for Affirmative Action, National Organization of Women.

upper ranks of the department. Moreover, minorities and women appeared to be concentrated in certain units, bureaus, and subdivisions in the department, while virtually absent in others. Plaintiffs claimed these discrepancies resulted primarily from the use of unvalidated written examinations and various other class-biased screening and selection devices. They sought classwide [2] relief, including declaratory, preliminary, and permanent injunctive relief, various affirmative remedial measures, class damages,[3] costs and attorneys' fees.

In November, 1973, plaintiffs moved for a preliminary injunction suspending the use of the hiring and promotional written examinations. The district court found plaintiffs' statistical demonstration sufficient to establish a prima facie case of racial discrimination [4] with respect to the entry-level hiring of patrolmen and promotions to the rank of sergeant, which the defendants were unable to defend as indicative of job performance.[5] *Officers for Justice v. Civil Service Commission ("O.F.J."),* 371 F.Supp. 1328, 1331–1333 (N.D.Cal.1973). However, the number of minority applicants taking

the examinations for promotions to ranks higher than sergeant was too small to support a statistically reliable statement of the differential effects of those examinations. *Id.* at 1333–1334. The district court enjoined the further use of the entry-level and sergeant-level promotional examinations and ordered that entry-level patrolmen be hired at a ratio of three minority applicants for every two non-minority applicants, and, similarly, imposed a one-to-one ratio for appointments to the rank of sergeant. Both ratio quotas were to remain effective until the minority composition in each category reached a minimum of thirty per cent. *Id.* at 1342–1343. The district court further ordered that future examinations and selection procedures were to be submitted to the court for review and approval.

By similar analysis, the district court ordered further preliminary injunctive relief in 1975. *O.F.J.,* 395 F.Supp. 378 (N.D.Cal. 1975). The court found that the 5'6" pre-selection height requirement for patrol officers had a statistically disproportionate, adverse impact on Asians, Latins and women

**2.** The class was defined as:

"[A]ll those Blacks, Latins, Asians, and women who (i) have failed either in entry-level or promotional examinations promulgated by the CIVIL SERVICE COMMISSION and POLICE COMMISSION for a position in the San Francisco Police Department and are fully qualified therefor or (ii) may become eligible to take such examinations to be given in the near future, or (iii) have passed such an examination but because of a low score, have not been or will not be appointed to the position applied for, or (iv) have passed such examination but because of a lack of seniority have not been appointed to the position applied for or (v) have been eliminated from contention for the position of sworn officer by reasons of certain biased elements in applicant screening procedures of the CIVIL SERVICE COMMISSION and POLICE COMMISSION or their delegates or (vi) will in the future be subjected to any of the discriminatory treatment alleged above or (vii) have in the past been discouraged and dissuaded from even attempting to join the department due to the discriminatory reputation of its selection devices, standards, and practices or (viii) have been discriminated against in assignment, choice of duties, or other incidents of employment, or (ix) who as a result of the above detailed practices and their exclusionary effects are deprived of protection and

safety in minority neighborhoods equal to that available in nonminority areas."
(Complaint, p. 6–7.) The terms "Latins" and "Asians" were further defined.

**3.** The class action allegations in the complaint indicate that plaintiffs were seeking class certification under Fed.R.Civ.P. 23(a) and (b)(3). In relevant part, the complaint reads as follows: "There are questions of the law and fact which are common to the class and such common questions clearly predominate over any questions affecting only individual members of the class. A class action is the only practical method for the fair and efficient adjudication of this controversy." (Complaint, p. 8) *See* Fed. R. Civ. P. 23(b)(3).

**4.** The motion before the district court concerned only alleged racial discrimination.

**5.** The reader should note that only the district court's final order approving the consent decree is before this court for review. Accordingly, we express no view as to the correctness of the preliminary rulings of the district court. It is observed, however, that in some instances the progression of this litigation could not keep pace with the developing changes in this area of law.

that the defendants could not justify by demonstrating job-relatedness, and its further use was enjoined. *Id.* at 381. Likewise, the defendants failed to defend the application of the physical agility test for patrol officers which was demonstrated to have an "almost total" adverse impact on women applicants.[6] *Id.* at 381–385. The court ordered adoption of an experimental program to select and place on patrol sixty female officers. *Id.* at 386. The court also withdrew its previously ordered minority hiring quota, permitting the defendants to proceed with hiring based upon a new entry-level list composed of nearly forty percent minority applicants. *Id.* at 387.

Disgruntled by the early results of hiring from the eligibility list generated by the newly designed entry-level examinations, plaintiffs returned to court in January, 1977, seeking to have a minority hiring ratio reinstated, but in the proportion of three-to-one. While disappointed by the initial results, Judge Peckham concluded that the shortcomings were largely attributable to unforeseen budgetary restraints and various other factors that were not likely to recur in the immediate future, thus the request for reimposition of hiring quotas was denied. *O.F.J.,* 20 FEP Cases 1304 (N.D.Cal.1977). However, the district court did extend its previously ordered quota on permanent promotions to the rank of sergeant to cover temporary promotions to that rank. These temporary promotions were necessitated by defendants' failure to devise a non-discriminatory examination to generate eligibility lists for permanent promotions. The sole criteria for making the temporary promotions was seniority. In ordering the quota extended, the court declared:

"We note with dismay that, given a free choice, defendants have chosen to utilize what is perhaps the most discriminatory possible criteria in light of this court's finding of discrimination at the Q-2 level [patrol officer], from whose ranks such promotions are made. It therefore comes as no surprise that virtually none of the temporary promotions made to date are minorities. We also note that defendants' ability to promote for an indefinite period on the basis [of] seniority under the limited tenure rule dissipates any incentive to design a validated exam permitting permanent appointments in accordance with our 1973 order. We find the inference strong that the three-years delay in designing such an exam is not a mere coincidence."

*Id.* at 1308. The district court's order, however, was stayed by our court pending appeal.

Plaintiffs invoked the district court's jurisdiction again in January, 1977, seeking preliminary injunctive relief from the examination used for promotions to the assistant inspector rank. In 1973, the district court found plaintiffs' statistical demonstration insufficient to establish a prima facie case of racial discrimination at that rank and preliminary relief was denied. Plaintiffs supported this motion, however, upon the results of a more recently administered examination in which a substantial number of minorities had participated. The district court again found the statistical showing inadequate to establish a prima facie case of discrimination,[7] but, upon closer analysis of the available data, preliminarily enjoined permanent promotions to assistant inspector. The court concluded that the test results raised serious questions regarding the adverse impact on minorities that, when coupled with the balance of hardships weighing sharply in favor of plaintiffs, justified the imposition of prelim-

---

**6.** In the briefs to this court, we were informed that prior to this litigation women were not permitted to apply for patrol work nor had they been tested for the position.

**7.** The passage rate for the examination indicated an adverse impact only as to Blacks. Consequently, the court noted that, "For the first time in this litigation, a potential conflict has arisen among the various racial subgroups comprising the plaintiff class. Accordingly, the specification of subclasses and separate representation for such subclasses, may be necessary before this matter can proceed to final adjudication." (citation omitted) *O.F.J.,* 20 FEP Cases 1309, 1312 n. 5 (N.D. Cal. 1977).

inary relief. *O.F.J.,* 20 FEP Cases 1309 (N.D.Cal.1977).

As mentioned above, plaintiffs' original claims were brought primarily under 42 U.S.C. § 1981 and § 1983. On January 6, 1977, plaintiffs were permitted to amend their complaint to state claims under Title VII. The amended complaint contained the specific allegations of twenty-five additional, individually named plaintiffs, each of whom had received a "right to sue" letter from the EEOC, as had some of the eleven original plaintiffs, including appellant Byrd. Plaintiffs' amendment came on the heels of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), wherein the Supreme Court held that, in contrast to Title VII standards, Constitution-based claims of racial discrimination cannot rest *solely* on racially disproportionate impact, but rather, must be premised upon a discriminatory motive or purpose. It should be noted here that each of the above referenced decisions by the district court rested on the recognized disparate impact theory of Title VII, even though plaintiffs' claims were stated under 42 U.S.C. § 1981 and § 1983.[8]

In May, 1977, over four years after the origination of this lawsuit, plaintiffs' motion for class certification under Fed. R. Civ. P. 23(a) and (b)(2) was granted. The district judge observed that two general categories of issues had emerged in the litigation: those arising from the claims of racial discrimination and those stemming from the sex discrimination claims. While noting similarities between the claims of the two groups, the district court thought it advisable to divide them into subclasses and to conduct the adjudication of the respective claims at separate trials. No adversity between subclasses or between the various racial minority groups was perceived, however, that would necessitate representation by separate legal counsel. Accordingly, the action was certified to proceed as a class action under Rule 23(a) and (b)(2) for purposes of injunctive and declaratory relief, but the court expressly deferred ruling upon certification of a class action with respect to plaintiffs' claim for damages until after a determination of liability. Notice to the class was ordered which specifically advised potential class members that upon timely request, they could be excluded from the class.

On June 22, 1977, plaintiffs filed their second and final amended complaint. We will describe the complaint in more detail in part V below. In December, 1977, the United States stepped into the thick of the action by filing a separate complaint against the defendants, alleging a pattern or practice of employment discrimination similar to that charged in the private plaintiffs' amended complaint. The suit was brought pursuant to the provisions of § 701 of Title VII, Civil Rights Act of 1964 as

---

**8.** The defendants relied on the holding in *Washington v. Davis* to challenge the district court's power to order preliminary relief absent a finding of intentional discrimination. *O.F.J.,* 20 FEP Cases 1304, 1305 (N.D. Cal. 1977). Judge Peckham recognized that his previous orders were not founded upon a specific finding of discriminatory intent, but noted, without deciding, that the record may have supported a finding of intent. Nevertheless, the district court rejected defendants' argument, ruling that the requirement of intentional discrimination under *Washington v. Davis* was limited to Constitution-based claims and plaintiffs had based their claims on the additional authority of 42 U.S.C. § 1981. The district court then cited our decision in *Davis v. County of Los Angeles,* 566 F.2d 1334 (9th Cir. 1977), for the proposition that § 1981 is co-extensive with Title VII, both as to liability and remedies, and that Title VII standards are fully applicable to

employment discrimination claims brought under § 1981. Following the district court's ruling, however, the Supreme Court vacated our decision in *Davis* on mootness grounds. *County of Los Angeles v. Davis,* 440 U.S. 625, 634, 99 S.Ct. 1379, 1384, 59 L.Ed.2d 642 (1979). Although the question remained open in this circuit for a short while, our recent decisions clearly establish that proof of intent is required for employment discrimination claims brought pursuant to 42 U.S.C. § 1981. *Williams v. Owens-Illinois, Inc.,* 665 F.2d 918, 928 (9th Cir. 1982); *Craig v. County of Los Angeles,* 626 F.2d 659, 668 (9th Cir. 1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981). Even as this decision was being written, the Supreme Court issued its decision in *General Building Contractors v. Pennsylvania,* — U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), laying to rest any doubt that § 1981 requires proof of intentional discrimination.

amended, 42 U.S.C. §§ 2000e, *et seq.*, the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1242, and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3766. The private and public suits were consolidated in January, 1978.

From June, 1977, through August, 1978, the parties simultaneously prepared for trial and engaged in negotiations in an attempt to settle the litigation. Eventually, a tentative settlement emerged supported by the public and private plaintiffs and counsel for the city, but vigorously opposed by the Police Officers Association (defendant-intervenor). The settlement effort was derailed when a majority of the San Francisco Board of Supervisors refused to endorse it.

In September, 1978, the district court ruled on the public and private plaintiffs' joint motion for partial summary judgment. The motion addressed only the entry-level examinations administered from 1969 through 1972 and the sergeant-level promotional examinations administered in 1971. Based upon the same analysis and evidentiary support underlying its preliminary injunction ordered in 1973, the district court granted the motion for the United States.[9] However, the private plaintiffs' motion was denied. The trial judge explained that the 1973 order was derived through the application of Title VII standards although plaintiffs' claims had initially been brought under 42 U.S.C. § 1981 and § 1983, and provisions of the United States and California Constitutions. The court then observed that under *Washington v. Davis, supra,* such an analysis was inappropriate with regard to the Constitutional and § 1983 claims. With respect to the § 1981 claims, the Supreme Court's intervening grant of certiorari in *Davis v. County of Los Angeles, supra* (437 U.S. 903, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (1978)), cast doubt on the continued validity of that holding.[10] Apparently, for these reasons, the private plaintiffs' motion was founded solely on their Title VII claims. Because the last appointment made from the eligibility lists gener-

ated by the examinations under attack had occurred well beyond three hundred days before the filing of the first charge with the EEOC, the district court concluded it was without jurisdiction to grant the requested relief.

Trial of the race discrimination issues began in November, 1978. The trial was recessed after two weeks to permit further settlement negotiations. During this recess, San Francisco suffered the tragic assassinations of its Mayor, George Moscone, and Supervisor, Harvey Milk. The recess was extended and the resulting negotiations produced a second consent decree that was approved by all parties and submitted to the district court on January 25, 1979. Hearings were set for approval of the class notice and for entertaining objections to the consent decree.

Having found the proposed consent decree "of sufficient substance to submit it to the class," the district court ordered that notice of the proposed settlement be given to the class. In May, 1977, the district court had certified a private plaintiff class under Rule 23(b)(2) for purposes of injunctive and declaratory relief only. For purposes of the proposed consent decree, the district court certified the class under Rule 23(b)(2) for injunctive, declaratory and back pay relief, "and under Rule 23(b)(3) for purposes of recovery of compensatory or punitive damages, if any." The class notice (Exhibit A attached hereto) advised the members of the class that they could appear before the court and present on their own behalf or through private counsel any objections to the settlement. The objections had to be made in writing to the clerk of the court by February 28, 1979.

A hearing on the fairness of the proposal and the objections to it was held on March 5, 1979. On March 30, 1979, the district court issued an order setting forth, responding to, and rejecting the objections to the settlement. *O.F.J.,* 473 F.Supp. 801 (N.D. Cal. 1979). The settlement embodied in the

---

**9.** We express no view on the correctness of the summary judgment. *See* note 5, *supra.*

**10.** *See* note 8, *supra.*

consent decree, which is reproduced in full in an appendix to the district court's order (473 F.Supp. at 809–826), was found to be "a just, fair and reasonable resolution of this action...." *Id.* at 808.

### III.

Appellant, Jesse Byrd, is a named plaintiff and class representative, and has been personally involved in nearly every phase of this litigation, including the settlement negotiations. As president of The Officers for Justice in 1973, he was instrumental in the initiation of this lawsuit. Many of the allegations in plaintiffs' complaints were based on an affidavit by Byrd which was incorporated into the complaints by reference. In addition, the plaintiffs filed with the court the sworn statements of Byrd and three other named plaintiffs outlining their testimony regarding intentional discrimination.

Dissatisfied with the terms of the proposed settlement, Byrd retained private counsel and, in accordance with the district court's order, submitted five specific written objections. Byrd contended that approval of the proposed settlement should be withheld because:

(1) the maximum individual monetary recovery is grossly inadequate;

(2) the "mitigation" clause, which may reduce the monetary distribution to class members holding specified positions on the force, is unfair and discriminatory to Byrd and other class members who served on the solo motorcycle detail;

(3) no monetary relief is provided to compensate Byrd and others for the emotional and physical distress allegedly suffered as a result of intentional discrimination;

(4) the $500,000 fund set aside by the City to pay the cost of implementing the proposed program of recruiting, training and promoting minorities should be utilized solely to compensate Byrd and others for their damages; and

(5) the proposed program of recruiting, training and promoting minorities will perpetuate the discriminatory practices for an unreasonable length of time.

Byrd and his counsel appeared at the fairness hearing and, with some variation, voiced these objections.[11]

### IV.

The class action device, while capable of the fair and efficient adjudication of a large number of claims, is also susceptible to abuse and carries with it certain inherent structural risks. As Judge Fay aptly observed in his special concurrence in *Johnson v. General Motors Corp.,* 598 F.2d 432 (5th Cir. 1979), "Class actions are unique creatures with enormous potential for good and evil." *Id.* at 439. Consequently, Fed. R. Civ. P. 23 establishes a procedural framework designed to protect against the shortcomings of the class action device.

■ Class action settlements are no different. Unlike the settlement of most private civil actions, class actions may be settled only with the approval of the district court. Rule 23(e) declares that, "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

---

**11.** Instead of contending that the $500,000 fund should be allocated for payment of compensatory damages to Byrd and others as set forth in the written objections, Byrd's counsel argued that the fund should be used to assure recovery of all back wages class members would have received absent defendants' discriminatory practices. Byrd has never maintained that defendants should not bear the implementation costs of the recruiting, training and promotion program outlined in the consent decree. Rath-

er, it has been his position that the settlement should have required the defendants to provide full recovery of back pay, or compensatory damages, or both, in addition to the implementation costs. Since he has objected to the amount of back pay and the absence of a provision for compensatory damages, his fourth objection, as enumerated above, does not state an independent objection, nor does it add to or strengthen the other objections. Consequently, we address only the remaining four objections.

The primary concern of this subsection is the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties. *Collins v. Thompson,* 679 F.2d 168, 172 (9th Cir. 1982); *Simer v. Rios,* 661 F.2d 655, 664 (7th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982); *Mendoza v. United States,* 623 F.2d 1338, 1344 (9th Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981); *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Norman v. McKee,* 431 F.2d 769, 774 (9th Cir. 1970), *cert. denied,* 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1971); *see generally* 7A Wright & Miller, Federal Practice and Procedure § 1797, p. 226 (1972).

Of course, the very essence of a settlement is compromise, "a yielding of absolutes and an abandoning of highest hopes." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977); *Moore v. City of San Jose,* 615 F.2d 1265, 1271 (9th Cir. 1980); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1169 (5th Cir. 1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *Mandujano v. Basic Vegetable Products, Inc.,* 541 F.2d 832, 835 (9th Cir. 1976). The Supreme Court has explained the nature of consent decrees:

"Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation . . . . [T]he parties have pur-

poses, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve."

*United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). Nevertheless, there exists the risk that the interests of some class members may be sacrificed in the effort to achieve the "greatest good for the greatest number." *Mandujano,* 541 F.2d at 835. As we have recently observed:

"It may be unavoidable that some class members will always be happier with a given result than others, but potential injustice arises as the distribution of benefits and burdens in a class remedy becomes increasingly unequal. Although maximizing the overall gain is a valid pursuit in resolving a class action, a small minority of the class members may not be asked to bear an unduly disproportionate share of the accompanying burdens."

*Mendoza,* 623 F.2d at 1344; *see also Pettway,* 576 F.2d at 1169.

■ As is generally true of the provisions of Rule 23, the protection afforded by subsection (e) is primarily procedural in nature. Thus, the class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice; the notice must indicate that a dissident can object to the settlement and to the definition of the class; each objection must be made a part of the record; those members raising substantial objections must be afforded an opportunity to be heard with the assistance of privately retained counsel if so desired, and a reasoned response by the court on the record; and objections without substance and which are frivolous require only a statement on the record of the reasons for so considering the objection.[12] *Mandujano,* 541 F.2d at 835–36;

---

12. *Mandujano* was a Title VII class action certified under Rule 23(b)(2). The opinion was written carefully to limit the discussion to settlements of class actions certified under Rule 23(b)(2). We note this only to indicate, but do not decide, that different requirements may be applicable to class actions certified under 23(b)(1) or (b)(3). Similarly, in *Mandujano,* some reliance was placed on the important interests secured by Title VII. Under the facts and circumstances of this case, however, nei-

*Pettway,* 576 F.2d at 1169; *Cotton,* 559 F.2d at 1331.

 Adherence to these procedures facilitates the second aspect of the district court's responsibilities when a class action settlement agreement is submitted for approval. Although Rule 23(e) is silent respecting the standard by which a proposed settlement is to be evaluated, the universally applied standard is whether the settlement is fundamentally fair, adequate and reasonable. *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 207 (5th Cir. 1981); *Moore,* 615 F.2d at 1271; *Pettway,* 576 F.2d at 1169; *Cotton,* 559 F.2d at 1330; *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir. 1977); *Grunin,* 513 F.2d at 123; *Norman,* 431 F.2d at 774. The district court's ultimate determination will necessarily involve a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement. *Pettway,* 576 F.2d 1157; *Cotton,* 559 F.2d 1326; *Marshall,* 550 F.2d 1173; *Flinn v. FMC Corp.,* 528 F.2d 1169 (4th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974). This is by no means an exhaustive list of relevant considerations, nor have we attempted to identify the most significant factors. The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case.

 The district court's role in evaluating a proposed settlement must be tailored to fulfill the objectives outlined above. In other words, the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned. Therefore, the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators. *Corrugated Container,* 643 F.2d at 212; *Moore,* 615 F.2d at 1271; *Cotton,* 559 F.2d at 1330; *Flinn,* 528 F.2d at 1173; *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826, 849 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); *Grunin,* 513 F.2d at 123.

 Ultimately, the district court's determination is nothing more than "an amalgam of delicate balancing, gross approximations and rough justice." *City of Detroit,* 495 F.2d at 468. Finally, it must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation, and even more so where the subject matter is employment discrimination. *Moore,* 615 F.2d at 1271; *Pettway,* 576 F.2d at 1214; *Cotton,* 559 F.2d at 1330–31.

 Our task on appeal is even more limited. The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge. *Cotton,* 559 F.2d at 1330; *City of Detroit,* 495 F.2d at 454–55; *Bryan v. Pittsburgh*

ther of the observations noted here raises ques- tions that would alter our analysis.

*Plate Glass Co.,* 494 F.2d 799, 801 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). "Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." *Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30, 34 (3d Cir. 1971). We are not to substitute our notions of fairness for those of the district judge and the parties to the agreement. *Cotton,* 559 F.2d at 1331; *Flinn,* 528 F.2d at 1172; *Allegheny-Ludlum,* 517 F.2d at 850. Consequently, we will reverse only upon a strong showing that the district court's decision was a clear abuse of discretion. *Moore,* 615 F.2d at 1271; *Marshall,* 550 F.2d at 1178; *Norman,* 431 F.2d at 774. As the court in *Flinn* observed:

"So long as the record before it is adequate to reach 'an intelligent and objective opinion of the probabilities of success should the claim be litigated' and 'form an educated estimate of the complexity, expense and likely duration of such litiga-

tion, . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise,' it is sufficient." (citations omitted)

528 F.2d at 1173. Of course, such an assessment is nearly assured when all discovery has been completed and the case is ready for trial. *Id.*

## V.

■ Before addressing Byrd's specific objections, we observe initially that most, if not all, of the standards and considerations just discussed weigh heavily against a conclusion that Judge Peckham acted arbitrarily or abused his discretion by approving this settlement. By the time the district court approved the settlement, this class action had become much more complex than when originally filed. The amended complaints included additional parties and claims for relief. Indeed, the cause had grown into an across-the-board pattern and practice lawsuit challenging a broad range of allegedly discriminatory employment policies and practices.[13] An examination of plaintiffs'

---

**13.** The following excerpts from plaintiffs' second amended complaint are illustrative:

"3. This class action seeking injunctive and declaratory relief, back pay, damages for emotional and physical harm, punitive damages and other remedial relief, is brought in behalf of minorities and women in the San Francisco area who are fully qualified to be Police Officers, but are either barred from such profession or denied equal treatment within the police profession due to the illegal and discriminatory practices of the Defendants. Among others, these practices include heavy reliance on and use of arbitrary, non-merit, anti-ability written tests which have not been validated; the unequal application of background investigations and evaluations; the maintenance and institutionalization of a promotional system which is inherently racist and sexist; the segregation of minorities and women by job assignments; the unjustified and *overt* exclusion of women from the department; and, most recently, an effort to make permanent these exclusionary and discriminatory practices through a statutory reorganization.

"In addition, the Defendants have, at times both prior *and* subsequent to the initiation of this litigation, engaged in and/or condoned a wide range of intentionally discriminatory practices. Among these practices are efforts

to obstruct justice by deliberately and maliciously harassing minority and female Police Officers actively pursuing their legal remedies in this litigation. (emphasis in original). (pp. 2–3).

\* \* \* \* \* \*

"7. The touchstones of this systematic and often intentional pattern of employment discrimination are (a) deliberate acts of discrimination including punitive action against minority and female officers, particularly those active in the pursuit of the present litigation; (b) written examinations that are non-job related, are not validated and disproportionately exclude minorities; (c) athletic examinations and height requirements that are non-job related, are not validated and disproportionately exclude Asians and women; and (d) Civil Service policies, neutral on their face, but applied selectively to exclude qualified minorities and women often in favor of unqualified Anglo males. (p. 6)

\* \* \* \* \* \*

"126. As a result of the specific and general examples of racial, ethnic and sexual discrimination set forth above, Defendants have promulgated a widespread pattern and practice of employment discrimination against individual and organizational Plaintiffs and the class which they represent. . . ." (p. 46)

claims for relief reveal that some possibly could have been prosecuted under Title VII on a disparate impact theory, where proof of intentional discrimination is not required. Yet the delay in the filing of charges with the EEOC severely restricted the applicability of this theory under Title VII to those facially neutral practices where plaintiffs' statistical evidence of disparate impact was much less convincing. For all other policies and practices challenged, the defendants' underlying motivations would have been the critical issue.[14] Regardless of the claim or theory of recovery, plaintiffs' burden of establishing a prima facie case of classwide discrimination would have been no easy chore. To establish classwide liability as to any particular employment practice, plaintiffs had to prove by a preponderance of the evidence that the unlawful discrimination alleged "was the [defendants'] standard operating procedure—the regular rather than the unusual practice." *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

The case had been aggressively litigated before Judge Peckham for six years, generating a voluminous record, and resulting in several pre-trial hearings and orders, including preliminary injunctions and a partial summary judgment for the United States. Discovery had been completed and trial of the race discrimination issues was underway. The settlement proposal now before us was not hastily arrived at and there is not a shred of evidence in the record suggesting the existence of collusion between the negotiators. The consent decree resulted only after long and careful negotiations in which the United States was a participant. In fact, this proposal was the second one presented to the court. The first proposal failed to receive assent by all parties although it had been modified at the suggestion of the district judge.

Moreover, Judge Peckham carefully observed the procedures discussed above. Byrd's retained counsel voiced the objections at the fairness hearing and Byrd personally participated in that hearing. Only two other groups of objections were presented. A small group of police sergeants opposed the consent decree, taking a position basically antithetical to the interests of the class. *O.F.J., supra,* 473 F.Supp. at 805–808. The other objector wanted specific relief from the departmental age requirements that could bar successful reapplication by some individuals allegedly discriminated against by past entry-level examinations. *Id.* at 808. Each objection raised was made a part of the record and accompanied by the district court's reasoned response thereto. Of the potentially thousands affected by the consent decree, only Byrd has appealed.

Finally, we think it is significant, in light of the applicable standard of review on appeal, that none of Byrd's arguments to this court specifically attack the sufficiency of the district court's reasons for approving the settlement over his objections. For this reason alone, we would be hard pressed to find an abuse of discretion. Nevertheless, we proceed to address his contentions.

## VI.

### A. Back Pay

Byrd contends that the amount of immediate, litigation-free back pay provided by the settlement is grossly inadequate. The aggregate monetary relief provided by the

---

14. We recognize, of course, that a prima facie case of discriminatory treatment under Title VII does not require direct proof of intentional discrimination. Rather, the plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act. The defendant must then articulate a legitimate non-discriminatory reason for the adverse employment action. If that is accomplished, the plaintiff is given the opportunity to establish that the proffered reason was a pretext or that it was discriminatorily applied. *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Proof of intentional discrimination is required under 42 U.S.C. § 1981 and § 1983. *General Building Contractors Association, Inc. v. Pennsylvania,* —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

consent decree is $900,000, of which $400,-000 is designated for payment of back pay, up to a maximum of $3,720 per individual claimant. In the district court, Byrd challenged the maximum individual recovery. On appeal, his contention focuses upon the total amount allocated for back pay. Either way, Byrd's arguments fall far short of demonstrating a clear abuse of discretion by the district court.

It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair. *Flinn,* 528 F.2d at 1173–74; *City of Detroit,* 495 F.2d at 455. This is particularly true in cases, such as this, where monetary relief is but one form of the relief requested by the plaintiffs. It is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness. Viewed in proper perspective then, the amount of back pay finally agreed upon is a less significant consideration than Byrd would have us believe. Moreover, it can hardly be maintained that back pay was the predominant remedy sought in this lawsuit. *See Cotton,* 559 F.2d at 1333. Throughout the lengthy history of this case, the primary concern of the plaintiffs was to halt the allegedly discriminatory practices and to assure the future integration of minorities and women into the S.F.P.D. The consent decree incorporates a variety of provisions to accommodate these concerns. Without admitting any violations of law, and by attaching their approval to the settlement agreement, defendants bound themselves to comply with a broad range of both restrictive and affirmative mandates covering every act, practice, policy, or custom addressed in plaintiffs' complaint. To this was added the grant of back pay, which is substantial, though potentially less than complete in some instances. Undoubtedly, the amount of the individual shares will be less than what some class members feel they deserve but, conversely, more than the defendants feel those individuals are entitled to. This is precisely the stuff from which negotiated settlements are made.

Even if we consider the back pay provisions in isolation, Byrd's contention must fail. Like all his objections, Byrd approaches these provisions as if he were appealing from the award of relief after a fully contested trial on the merits instead of from a judgment approving a settlement of the case. Byrd relies entirely on *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974), wherein the court commented that whenever defendants' liability has been prima facie established, "any party wishing to justify a settlement offer that amounted to only a small fraction of the ultimate possible recovery would appear to have a very substantial burden of proof." *Id.* at 455. We think it unnecessary to decide whether this language correctly states an appropriate legal standard because, like the objectors in that case, Byrd is unable to demonstrate its applicability. At this stage of the proceedings, that is clearly his burden to carry. Contrary to his assertions, defendants' liability for class-wide back pay had not been prima facie established, nor do the district court's pretrial orders, its order approving the consent decree, and its findings of fact and conclusions of law suggest that "liability should be a certainty." (Appellant's Brief p. 7). Every favorable ruling issued by the district court was arrived at through the application of a Title VII disparate impact theory, which, with two possible exceptions, would have been unavailable to the plaintiff class under current law.

In light of the delay in filing administrative charges, plaintiffs may have been able to utilize the disparate impact theory to challenge the temporary appointment of sergeants on which the district court imposed a one-for-one quota in 1977. Even at the time of its issuance, however, that ruling was stayed by this court pending appeal. The second exception where the theory may have been available was plaintiffs' attack on the use of an assistant inspector's examination which was enjoined in 1977. However, with regard to that examination, plaintiffs' statistical evidence was insuffi-

cient to establish a prima facie case of discrimination. Use of the examination was enjoined because the district court concluded that serious questions were raised and the balance of hardships tipped sharply in plaintiffs' favor. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 88 (9th Cir. 1975). Nor can it be overlooked that plaintiffs' only effort in the litigation to obtain a final determination of defendants' liability resulted in an adverse ruling on their motion for partial summary judgment. The district court's orders just simply do not make Byrd's case for him. In fact, the district judge denounced the argument now advanced by Byrd. Had the district court's orders so clearly signaled the certainty of defendants' liability for classwide back pay, as Byrd has interpreted them to do, we find it remarkable indeed that Judge Peckham rejected this objection, emphasizing the "costs and risks of litigation...." *O.F.J., supra,* 473 F.Supp. at 808.

Shifting the point of analysis, we are also unpersuaded by Byrd's unfounded predictions of much larger awards had the case been fully tried on the merits. There is simply no indication in the record, nor a showing by Byrd on this appeal, that any judgment reached after a full trial would be sufficiently large, when discounted, to reward the class members for their patience. *See City of Detroit,* 495 F.2d at 467. As the district court observed, any benefits above those provided by the decree would likely be substantially diluted by the delay inherent in acquiring them. *O.F.J., supra,* 473 F.Supp. at 808. The track record for large class action employment discrimination cases demonstrates that many years may be consumed by trial(s) and appeal(s) before the dust finally settles. *See Cotton,* 559 F.2d at 1331. This case is exemplary. After six years, trial of only the race discrimination issues had finally begun with the testimony of a single witness. During the remainder of the litigation, and probably an appeal, many of the immediate and tangible benefits accruing from the settlement would be lost.

Finally, we note that only Byrd objected to the amount of back pay provided, thus calling to service the oft-quoted observation found in *City of Detroit,* 495 F.2d at 462:

> "Any claim by appellants that the settlement offer is grossly and unreasonably inadequate is belied by the fact that, from all appearances, the vast preponderance of the class members willingly approved the offer."

We are convinced that the district court properly considered this objection and found it lacking sufficient substance to warrant withholding approval of the settlement proposal.

### B. Mitigation

■ As applied to Byrd, the back pay provisions of the consent decree were designed to compensate him for the pay differential resulting from his failure to be promoted from patrolman to the rank of sergeant. For this purpose, the consent decree contains a "mitigation clause" which *may* operate to reduce the amount of back pay received by individuals occupying certain specified positions on the force. The possible reduction is effected by offsetting against the amount of back pay accrued the increment of higher salary paid to those position holders. For example, a patrol officer assigned to the solo motorcycle detail, like Byrd, receives an increment of increased salary for the risks attendant with that duty, which is usually referred to as "hazard pay." The mitigation clause would work to deduct this "hazard pay" from the total amount of back pay accrued as computed in accordance with the "Guidelines for Distribution." (473 F.Supp. at 824–26).

Byrd's challenge to this provision rests upon a mischaracterization of the district court's ruling. The district court did not reason, as Byrd suggests, that because members of the solo motorcycle detail were paid more, they received as much compensation as they would have absent any discrimination. Rather, the district court determined that, in all probability, Byrd would not have received sergeant's pay *and* hazard pay. The departmental assignment policy is such that it is very unlikely for a ser-

geant to serve on the solo motorcycle detail. Consequently, in the vast majority of cases, patrol officers on the solo motorcycle detail who were denied promotion to the sergeant's rank would not have continued to receive "hazard pay," but for the denial of that promotion. This is not to say that a sergeant could never or would never serve on that detail, but the provisions of a class action settlement must be viewed in terms of a range of probabilities, not mere possibilities. Exactitude in application is not required. We find the mitigation clause an entirely reasonable provision.[15]

### C. Compensatory Damages

Byrd's next objection to the consent decree is that it provides no monetary compensation to him and others for emotional and physical distress allegedly suffered as a result of the unlawful acts and practices charged in the complaints. First, he argues that the district court's failure to designate the individually named plaintiffs as a subclass allowed their interests to be underrepresented. Second, he argues that the purported certification of a class under Rule 23(b)(3) for purposes of the consent decree should have permitted him to opt out of the class and independently pursue his damage claims against the defendants. He requests that we either reverse the district court's order approving the consent decree and remand for further negotiations and/or litigation, or that we somehow relieve him from the decree's bar to future litigation so that he may pursue an action for damages against the defendants. The Officers for Justice joins with Byrd in arguing that he should be permitted to seek further relief.

■ Initially, it must be recognized that we are not presented with a choice between alternative remedies. Neither the district court nor this court is empowered to rewrite the settlement agreed upon by the parties. We may not delete, modify, or substitute certain provisions of the consent decree. Of course, the district court may suggest modifications, but ultimately, it must consider the proposal as a whole and as submitted. Approval must then be given or withheld. Our only alternatives on appeal are to vacate and remand upon a determination that the district court abused its discretion, or to affirm its judgment. In short, the settlement must stand or fall as a whole. *Pettway,* 576 F.2d at 1172; *Cotton,* 559 F.2d at 1331–32; *Allegheny-Ludlum,* 517 F.2d at 850. We turn now to Byrd's arguments.

#### 1. *Representation*

■ Byrd's claim that his interests were inadequately represented by reason of the district court's failure to certify the individually named plaintiffs as a subclass is ludicrous. Rule 23(c)(4)(B) provides for the creation of subclasses, but each subclass must independently meet the requirements for the maintenance of a class action. *Betts v. Reliable Collection Agency, Ltd.,* 659 F.2d 1000, 1005 (9th Cir. 1981). A proposed subclass consisting of the individually named plaintiffs is, by definition, not "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

■ Moreover, Byrd is in no position to impugn this settlement on grounds of inadequate representation. He was represented by his own counsel during the class action settlement hearing and is, therefore, precluded from challenging the adequacy of representation by reason of his own participation in the suit. *Dosier v. Miami Valley Broadcasting Corp.,* 656 F.2d 1295, 1299 (9th Cir. 1981). Class representatives do not bind dissenting class members. A proposed class action settlement is ineffectual until it has received the approval of the district court, and Byrd's interests were adequately represented through his own participation

---

**15.** We are somewhat disappointed that Byrd did not confer with defendants to ascertain whether the mitigation clause would work to reduce his back pay award before presenting this issue on appeal. He was the only person to object to the provision, and the only objector to appeal. In their brief, The Officers for Justice have represented that their counsel and counsel for defendants have preliminarily concluded that Byrd would receive the maximum individual recovery of $3,720.

in the settlement hearing. *See Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d at 803.

Although we were not impressed by Byrd's attack on the adequacy of representation, his arguments did raise a question which has caused us some concern. Byrd has maintained that the individually named plaintiffs were the only class members seeking damages for emotional and physical distress.[16] We have indicated above that ordinarily a small, definable group of class members should not be called upon to bear an unduly disproportionate share of the compromises made in the settlement process. We have carefully examined the record, however, and we must conclude that the named plaintiffs are not required to make such unequal sacrifices by this consent decree.

Byrd's assertion to the contrary rests solely on the language of the second amended complaint. In pertinent part, the prayer for relief in that complaint asks the court "[t]o award to the named Plaintiffs money damages for their loss of wages, and for emotional and physical distress." However, the next paragraph of the prayer reads: "To award to the plaintiff class back pay and other appropriate compensation in addition to an award of punitive damages." With the exception of a request for costs and attorneys' fees, these two paragraphs represent plaintiffs' entire request for monetary relief. Arguably, the request for class relief is broad enough to encompass every form of monetary relief, including damages for emotional and physical distress, that could have been awarded after a finding of liability on the claims set forth in the complaint. It is not significant that the prayer for relief treats the named plaintiffs' requests separately from the requests for the plaintiff class. In a class action suit of this kind where a pattern or practice of discriminatory treatment is alleged, plaintiffs usually attempt to meet their burden of proof by presenting statistical evidence bolstered by the testimony of individual plaintiffs recounting specific instances of discrimination. *See Teamsters, supra,* 431 U.S. at 336–339, 97 S.Ct. at 1854–1856. It is entirely possible, even common, for the individual witnesses to prove their individual cases of discrimination while failing to establish overall liability to the class. For this reason, the named plaintiffs' prayer for relief is often pleaded separately from the requests for class relief. On the sole basis of the language in the complaint, therefore, it is unclear whether only the named plaintiffs requested compensatory damages for emotional and physical distress.

More important to the analysis, however, stands the fact that there is nothing to differentiate the group of named plaintiffs from the individual class members with respect to the potential recovery of monetary relief for emotional and physical distress. The defendants were charged with having engaged in a widespread pattern and prac-

---

**16.** The arguments of Byrd and The Officers for Justice imply that the named plaintiffs' request for damages for emotional and physical distress was based on their claims of racial and sexual intimidation and harassment. For many reasons, we are skeptical of that assertion. The complaint alleged a widespread pattern and practice of employment discrimination. The prayer for relief does not identify the claims on which those damages were sought. Compensatory damages of that type could have been requested on a number of the claims of intentionally discriminatory treatment and, in fact, harassment was described in the second amended complaint as merely one among a wide range of intentionally discriminatory practices engaged in or condoned by the defendants. Moreover, some named plaintiffs had never been police officers, yet the specific allegations of the complaint state only that minority and female *police officers* had been subjected to harassment and intimidation. On the record before us, we are more inclined to believe that the request for compensatory damages was based on any one or more of the various intentionally discriminatory acts or practices alleged, rather than on any single act or practice in particular. At the fairness hearing, Byrd's counsel stated, "In the last amended complaint, individual plaintiffs, and specifically Mr. Byrd, alleged that they had been subjected to emotional and physical distress over a long period of time because of intimidation, harassment *and discriminatory practices* within the Police Department." (Emphasis added) (R.T. Vol. IV, p. 57). The joint pretrial statement of the United States and private plaintiffs (C.R. No. 443) lends additional and substantial support to our view.

tice of unlawful employment discrimination. The complaint alleges no acts, practices or policies that affected all the named plaintiffs and only them. Every cause of action set forth in the complaint was specifically stated as a class claim. Nor has Byrd ever maintained that only the named plaintiffs experienced the degradation, humiliation and frustration that commonly results from invidious discrimination such as that alleged in the complaints here. In fact, some named plaintiffs most likely suffered fewer of these anxieties than many class members. For example, the first six individuals named never became police officers and, consequently, could not have been victimized by much of the discriminatory treatment that Byrd emphasizes in justification for his entitlement to compensatory damages. If those six individuals who challenged only defendants' hiring practices were entitled to damages for emotional and physical distress, then the vast majority of class members could likewise seek those damages.

Finally, the provisions in the consent decree that purport[17] to operate as a bar to future litigation and a waiver of the right to seek further relief for the acts, practices or omissions alleged in the complaints are fully applicable to and binding on the named plaintiffs and all class members alike. Every individual subjected to intentional discrimination potentially could have sought damages for emotional and/or physical distress; yet, by the terms of this consent decree, they are precluded from seeking such relief whether or not it was sought on their behalf in this particular action. Viewed in terms of the relief potentially recoverable rather than simply requested, as the terms of this consent decree seem to warrant, it cannot be said that the named plaintiffs were called upon to make unduly disproportionate sacrifices.[18]

■ Any differences in injury suffered by the named plaintiffs in comparison to the class members is one of degree. We understand Byrd's dissatisfaction. He has been personally involved in, and a moving force behind, this litigation. His testimony and that of other named plaintiffs was to be used to establish intentional discrimination. He may very well have had stronger claims than most class members, but he joined in bringing this action as a class action and, by so doing, he has disclaimed any right to a preferred position in the settlement.[19] *Flinn*, 528 F.2d at 1176; *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 506 n. 5 (5th Cir. 1981).

### 2. Certification

For purposes of the consent decree, the district court certified a class action under

---

**17.** Of course, we may not finally determine on this appeal the preclusive effect to be accorded the judgment approving this consent decree. Such a determination can only be made within the context of a concrete factual situation.

**18.** We do not intend to suggest that class representatives may not state individual claims for relief in addition to class claims, but they did not here. Similarly, class representatives need not request every type of relief for the class that they seek for themselves, although we think they did here. At any rate, where a particular type of relief potentially available to the class members is compromised in the settlement process, it is mainly irrelevant whether or not that relief was specifically requested in the complaint. The breadth of negotiations is not necessarily strictly confined by the pleadings.

**19.** It is interesting to note here that the very first settlement proposal disclosed to the district judge contained a monetary award for the named plaintiffs in excess of $800,000. However, the district court apparently suggested certain modifications. The modified proposal provided a special monetary fund for the named plaintiffs in the amount of $108,000. The pertinent section reads in part:

"Each named Plaintiff, in recognition of his/her effective representation of the class and of the personal efforts made by them in litigating the Plaintiff claims herein, shall receive $1,000 from a total of $108,000. The remainder of the fund ($72,000) will be distributed in accordance with the recommendations of the private Plaintiffs, subject to proof approved by the Master. These recommendations shall reflect recognition of additional claims for back pay in excess of that available from paragraph 13(b)(1) ["Back Pay for Class Members"] and the personal efforts and leadership role played in this litigation. . . ."

This modified proposal, however, was rejected by the San Francisco Board of Supervisors.

Fed. R. Civ. P. 23(b)(2) for back pay, declaratory and injunctive relief, and under Fed. R. Civ. P. 23(b)(3) for compensatory and punitive damages. Byrd argues that since the class was certified under Rule 23(b)(3), he must be permitted to exclude himself from that class pursuant to Rule 23(c)(2)(A), and pursue his individual damage claims against the defendants. We disagree.

■ Again, Byrd's argument fails to account for the difference between a judgment approving the settlement of a class action suit and a judgment entered after a fully litigated trial on the merits. Because class actions vary so widely in their circumstances, the trial judge is vested with broad discretionary control over the conduct of such actions enabling the presiding judge to respond fluidly to the varying needs of particular cases. *Mendoza,* 623 F.2d at 1344; *Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1309 (9th Cir. 1977). Within the context of class certification, Rule 23(c)(1) specifically provides that the district court's determination on the maintainability of a class action "may be conditional, and may be altered or amended before the decision on the merits." Consequently, before entry of a final judgment on the merits, a district court's order respecting class status is not final or irrevocable, but rather, it is inherently tentative. *General Telephone Co. of the Southwest v. Falcon,* —— U.S. ——, ——, 102 S.Ct. 2364, 2371, 72 L.Ed.2d 740 (1982); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 n. 11, 98 S.Ct. 2454, 2458 n. 11, 57 L.Ed.2d 351 (1978). For example, we have recently affirmed a district court's decision to decertify a class following the plaintiffs' failure to produce any evidence of classwide discrimination. *O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 869 (9th Cir. 1982). Under the circumstances of that case, we reasoned that "[s]ince plaintiffs' failure to produce evidence may have been due to inadequate representation of the class interests rather than to absence of classwide discrimination, decertification avoided any res judicata effect against the class." *Id.*

Perhaps the main reason for the tentative nature of class status determinations is that they generally involve considerations that are closely tied to the factual and legal issues of the case. *Coopers & Lybrand, supra,* 437 U.S. at 469, 98 S.Ct. at 2458. As a leading treatise explains:

"Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims. The typicality of the representatives' claims or defenses, the adequacy of the representative, and the presence of common questions of law or fact are obvious examples. The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits...."

15 Wright, Miller & Cooper, Federal Practice and Procedure § 3911, p. 485 n. 45 (1976). This relationship between the certification determination and the merits of the case is further attenuated within the context of the settlement evaluation process by the limits there placed on the district court's consideration of the underlying merits. Necessarily then, certification issues raised by class action litigation that is resolved short of a decision on the merits must be viewed in a different light.

In this case, we have serious doubts, but no way of knowing, whether all aspects of this cause could have been litigated to a conclusion entirely within the class action mode. We are not, however, faced with that situation. For purposes of the consent decree, the district court certified the case as a class action under Rule 23(b)(2) and (b)(3), but no opportunity to opt out was then provided. A literal reading of Fed. R. Civ. P. 23(c)(2)(A) would suggest that the class members should have been allowed that option. Given the circumstances and posture of this case, however, we do not believe that blind adherence to such technical literalism is compelled. Rather, we think it is more appropriate to consider, consistent with the design of Rule 23, whether Byrd's due process rights were observed. We think they were.

In May, 1977, plaintiffs' motion for class action certification under Rule 23(b)(2) was granted. In its certification order, the district court subdivided the racial minorities and the women into separate subclasses and, for convenience, ruled that the issues pertaining to each subclass would be determined in separate trials. The *action* was certified under Rule 23(b)(2) for purposes of injunctive and declaratory relief. Certification with respect to the plaintiffs' claims for damages was deferred "until after a determination of liability." Notice to the class was ordered. After a brief description of the parties and an account of the history of the lawsuit, the notice reads:

"At the trial beginning in early 1978, the plaintiffs are expected to introduce evidence of, and attempt to prove, both a pattern and specific instances of employment discrimination, derogatory racial conduct by police officers, and lack of police service or poor quality of service to minority communities in San Francisco. The remedies plaintiffs seek for this alleged employment discrimination include: compensatory and preferential employment opportunities for minorities and women at the entry and promotional levels, major changes in the recruitment and training of minorities and women, monitoring of the police department by the court for approximately ten years, and attorneys' fees. *If the court finds at the upcoming trial that there has been employment discrimination by the defendants, a later trial will be held to determine the amount of monetary relief due, if any. The amount of monetary damages eventually awarded possibly could include back pay and other compensatory damages.*" (emphasis supplied)

Also included in the notice to the class was an opt-out provision which reads:

"Therefore, if you are a member of one of the groups described above, you have three possible courses of action available:

"1. You may decide to take no action. If you choose to do this, *you will be included in the plaintiff class* and share in any relief eventually awarded to the class. If the court decides the case in

favor of the City, you will not be able to bring any further action against the City and County of San Francisco based on past acts of racial, ethnic or sexual discrimination by the police department that are raised by the complaint in this case.

"2. If you do not wish to be bound by the upcoming trial, you may request to be excluded from the class. If you wish to be excluded from the class, you must request such exclusion in writing in the manner explained below, no later than January 31, 1978.

"3. As a member of the plaintiff class, you may come forward, intervene personally in the action, and be represented by counsel of your own choice." (Emphasis in original)

Essentially, the procedure adopted by the district court was to bifurcate the trial into a liability phase and a monetary remedy phase. In the liability phase, all of the claims for relief stated in plaintiffs' complaint were to be litigated. During that phase, however, the action would only have been certified under Rule 23(b)(2), and only for declaratory and injunctive relief, if any. The trial judge then could have certified a class for monetary relief, including damages, *after* his determination of defendants' liability. We do not necessarily approve this procedure, but if the district judge erred by employing it, his error favored the plaintiff class. Had the representative plaintiffs failed to establish any classwide liability for monetary relief, the district judge may not have certified a class, thus arguably leaving class members free to pursue their individual claims for monetary relief.

 Given the breadth and nature of the claims asserted, the class action allegations in plaintiffs' complaint, and the procedures adopted by the district court, it appears clear that this case was in essence a Rule 23(b)(3) class action. The class notice precisely parallels the requirements of Rule 23(c)(2), which is expressly applicable only to class actions maintained under Rule 23(b)(3). All named plaintiffs and class

members were given the opportunity to exclude themselves from the class. Byrd did not. His argument amounts to a request to now exercise that option once passed over, and after being fully informed of the terms of the settlement. Although some class action settlements have provided such an opt-out feature, they are unusual and probably result from the bargaining strength of the class negotiators. Nevertheless, we have found no authority of any kind suggesting that due process requires that members of a Rule 23(b)(3) class be given a second chance to opt out. We think it does not. Byrd's rights are protected by the mechanism provided in the rule: approval by the district court after notice to the class and a fairness hearing at which dissenters can voice their objections, and the availability of review on appeal. Moreover, to hold that due process requires a second opportunity to opt out after the terms of the settlement have been disclosed to the class would impede the settlement process so favored in the law. "[A]llowing objectors to opt out would discourage settlements because class action defendants would not be inclined to settle where the result would likely be a settlement applicable only to class members with questionable claims, with those having stronger claims opting out to pursue their individual claims separately." *Kincade,* 635 F.2d at 507.

The arguments advanced by The Officers for Justice in support of Byrd's contention are more sophisticated, but no more persuasive. They argue that the "claims" for compensatory and punitive damages were never certified until the district court ordered class action certification under Rule 23(b)(3) for purposes of the consent decree.[20] They claim that the 1977 certification order under Rule 23(b)(2) per-

tained only to the claims regarding defendants' hiring and promotional practices. Therefore, it is asserted that Byrd did not have to exercise the option to exclude himself from that class in order to preserve his right to independently pursue his individual damage claims, and that he must have again been given the option when the action was certified under Rule 23(b)(3).

This argument is disposed of by what we have already said. There is absolutely no support in this record for the proposition that only certain claims were to be litigated in the class action originally certified under Rule 23(b)(2). All of plaintiffs' claims were to be litigated in the liability phase of the trial, not simply those focusing on the hiring and promotional practices. Much is made of the class description which defines the class in terms of the various examinations challenged in the complaint. We fail to see, however, what further specification in the definition of the class was needed. The damage claims cut across the entire spectrum of the class as defined. Moreover, because individual damages were sought, it is conceded that Rule 23(b)(3) certification would have been required. We find it entirely reasonable, therefore, that the class was described in terms of the hiring and promotional practices challenged. It was those practices that presented the questions of law or fact common to the members of the class that predominated over any questions affecting only individual members, and which could have made the class action superior to other available methods for the fair and efficient adjudication of the controversy. *See* Fed. R. Civ. P. 23(b)(3).

D. Recruiting, Training and Promoting

Byrd's final contention [21] is that the program of recruiting, training, and pro-

---

**20.** Class actions are certified, not claims for relief or requests for certain types of relief. However, class actions can be maintained with respect to particular issues. Fed. R. Civ. P. 23(c)(4)(A).

**21.** In this appeal, Byrd states three additional grounds for reversal that were not raised or argued in the court below. As a general rule, we will consider such arguments only where

necessary to prevent a manifest injustice. *Friedman and Jobusch, Architects and Engineers v. C.I.R.,* 627 F.2d 175, 177 (9th Cir. 1980). We see no reason for deviating from this general rule where the judgment being reviewed is the approval of a consent decree, and Byrd has failed to demonstrate how our refusal to consider his improperly raised argu-

moting contained in the consent decree will perpetuate the allegedly discriminatory practices for an unreasonable period of time. His crystal ball predictions just simply are not convincing. It *may* be that full integration of, and realization of equal treatment within, the S.F.P.D. could have been accomplished quicker through "court-imposed remedies uncomfortable for all and popular with no one." *O.F.J.,* 473 F.Supp. at 803. But, that result hinged on disputed issues of fact and law which must remain unresolved. A settlement proposal need not provide the best or speediest relief imaginable to be fair, adequate, and reasonable. Finally, this argument has effectively been refuted by actions taken since this appeal was filed. In August, 1979, the first recruiting and hiring done under the terms of the consent decree was completed. The Officers for Justice believed that the results did not comply with the decree and injunctive relief was sought. The district court entered an order cutting in half the amount of hiring the City could do, and creating a "Consent Decree Unit" to insure that the City would meet its future obligations. In addition, the organizational plaintiffs have, through active participation and communication with the Auditor/Monitor, overseen the implementation of other aspects of the decree. As a result, the composition of new recruits since the settlement has conformed to the provisions of the consent decree: fifty percent are racial minorities, and twenty-one percent are women. In short, the representative plaintiffs have demonstrated their intent and ability to fully enforce the provisions of the decree.

## VII.

Byrd has failed to demonstrate an abuse of discretion by the district judge in approving this consent decree. Accordingly, the judgment of the district court is

AFFIRMED.

ments would work an injustice. Such a result is nearly foreclosed where, as here, the arguments do not attempt to impugn the fairness and adequacy of the terms of the settlement.

EXHIBIT A

### NOTICE OF PENDENCY OF CLASS ACTION AND NOTICE OF PROPOSED SETTLEMENT THEREOF

There are two lawsuits presently pending in the United States District Court for the Northern District of California. The first is entitled *Officers for Justice, et al. v. Civil Service Commission, et al.,* No. C–73–0657 RFP. The second is entitled *United States v. City and County of San Francisco, et al.,* No. C–77–2884 RFP. The cases have been consolidated for purposes of trial or settlement.

These two lawsuits are based upon allegations by both the private and governmental plaintiffs that the City and County of San Francisco discriminated against racial and ethnic minority group members, as well as women, with respect to entry into and promotion within the San Francisco Police Department. The private plaintiffs also have alleged that the terms and conditions of employment within the San Francisco Police Department have been racially and sexually discriminatory. Both the City and County of San Francisco and the intervenor San Francisco Police Officers Association have denied the truth of the allegations made by the plaintiffs in both suits.

The lawsuit entitled *Officers for Justice, et al. v. Civil Service Commission, et al.* is a class action on behalf of racial and ethnic minority persons, as well as women. The *Officers for Justice* lawsuit has been certified as an appropriate class action. Subclass (a) consists of all Blacks, Hispanics, and Asians (including Chinese, Filipinos, Japanese, Koreans, and other Pacific Area people) who:

(a) completed the entry level Q–2 or Q–20 examination administered by defendants during the years 1969–72, but failed or placed so low that there was no likelihood of their permanent

Moreover, we have looked into these arguments and find that they lack support in the record, lack foundation in the law, or are answered by our decision on the issues properly presented in this appeal.

appointment, or who were disqualified because of height;

(b) applied for the 1974 Q–2 examination, but were discouraged or dissuaded from completing the examination process as a result of alleged discriminatory practices of defendants;

(c) completed the 1974 Q–2 examination, but failed or placed so low that there is no likelihood of their permanent appointment;

(d) have been discriminated against in any temporary or permanent promotions or other benefits by their lack of seniority in the police department which is the cumulative effect of discrimination at the entry level;

(e) completed the 1971 Q–50, or 1972 Q–35 promotional examinations, but failed or placed so low that they did not receive appointment; or

(f) failed the 1976 Q–35 or Q–50 promotional examinations, or would not have received appointment but for the provisions of paragraph 10(a) of the proposed Consent Decree;

Subclass (b) consists of all women who:

(a) took the last Q–20 examination and did not receive appointment from the eligible list;

(b) applied for the 1974 Q–2 examination, but were discouraged or dissuaded from completing the examination process as a result of discriminatory practices of defendants;

(c) completed the 1974 Q–2 written examination, but did not complete the full selection process or were disqualified on the basis of the physical agility examination;

(d) were appointed to the position of Q–2 patrol officer as a result of this Court's order of May 5, 1975, 395 F.Supp. 378; or

(e) were Q–20 police women who were precluded, because of their sex, from eligibility for the Q–50 examination process until 1976.

A settlement of the above-referenced lawsuits is now being considered. The set-tlement contains specific goals and timetables for the hiring of significant numbers of racial and ethnic minorities and women. The long-term goal shall be to raise the minority representation to 45 percent of the sworn personnel of the San Francisco Police Department. For the next 10 years or until the long-term goals are reached, the City shall seek to achieve goals of filling at least 50 percent of available vacancies with qualified minority applicants, and 20 percent with women.

The settlement also enhances the opportunities for promotion of minorities and women within the Police Department due to the adoption of goals and timetables as well as modifications made in the selection procedures. The City shall make offers of promotion to the ranks of sergeant or assistant inspector to all eligible officers presently on the respective 1976 informational rosters of candidates. Thereafter, the City shall seek to achieve promotional goals for women and minorities proportional to their representation in the qualified applicant pools. The size of the sworn police force shall be increased to 1971 by August 1, 1981, and present annual rates of promotion to the ranks of sergeant, assistant inspector, lieutenant, and captain shall be maintained.

The settlement also provides monetary compensation in the form of back pay to certain persons (up to $3720 apiece) and appropriate sums to facilitate the City's carrying out its hiring and promotion goals and obligations, to be used primarily for recruitment, testing, training, and professional upgrading and leadership opportunities for minorities and women. Fees for the private plaintiffs attorneys will be set by the Court and paid by the City, but they will not affect or be deducted from the compensation amounts described above.

The Court will appoint persons to monitor the implementation of these goals and obligations and to administer the back pay awards.

A copy of the proposed Consent Decree, which is the most complete statement of the settlement, is available for examination by persons who may be members of the plain-

tiff class, or their designated counsel, in the Office of the Clerk, United States District Courthouse, 450 Golden Gate Avenue, San Francisco, California, Monday through Friday, between the hours of 8:30 a.m. and 4:30 p.m., holidays excluded, during the period from February 5, 1979 to February 28, 1979. If the Consent Decree is finally approved after the Court considers any objections, all claims of class members will be finally settled and compromised. The Court will hold a hearing concerning final approval of the settlement and Consent Decree on March 5, 1979 at 2:00 p.m.

If you are a member of one of the groups described above, you may be a member of the plaintiff class in the *Officers for Justice suit.* As a possible class member, you have two possible courses of action available:

1. You may decide to take no action. If you choose to do this, you will be included in the class. If the Court approves the proposed settlement, you will not be able to bring any further action against the City and County of San Francisco based on past acts of racial, ethnic or sexual discrimination as raised in the complaint filed by the private plaintiffs herein. As a class member, you may enjoy the prospective benefits of the Consent Decree, including the monetary benefits.

2. You may come forward as a member of the class and object to this settlement if you believe that it is not fair to the class. You may present the objections yourself or through an attorney of your own choosing in the manner explained below.

All objections must be made in writing and sent by first class mail and received by the Clerk not later than February 28, 1979. The envelope should be addressed as follows:

> CLERK, UNITED STATES DISTRICT COURT
> 450 Golden Gate Avenue
> San Francisco, CA 94102
> Re: Officers for Justice, et al. v.
> Civil Service Commission, et al.
> No. C–73–0657 RFP and
> United States v. City and County
> of San Francisco, et al.
> No. C–77–2884 RFP

It is very important that the envelope and the document inside contain the name and number of the case.